May it please the Court. My name is Peyton Healy, and I represent Plaintiff L.G., Petitioner L.B.G. Motorsports, in this appeal. The first issue that I intend to address is whether two powerful business entities may enter into a combination that precludes a competitor of one of those entities from getting a product necessary to compete. I believe that under the rule of reason announced— How is L.G. Motorsports a competitor of either GM or Michelin? Michelin manufactures tires, GM manufactures automobiles, and GM, I suppose, has a racing team to enhance, but how is it a competitor? Yes, absolutely, Justice. With respect to Michelin, yes, clearly L.G. is not a direct competitor of Michelin. We will certainly concede that. With respect to GM, GM has a race team, which is called—it goes by the name Corvette Racing, and it's run by a man named Mark Kent, and they are a direct competitor of L.G. Motorsports in the American Le Mans Series, where L.G. Motorsports races its C6 Corvette, or raced, rather, its C6 Corvette. So it is a direct competitor of GM in that particular context. Additionally, Your Honor, one important area where they compete is that L.G. supplies aftermarket parts for Corvettes. L.G. supplies aftermarket parts for Corvettes in the industry, and this American Le Mans Series race is one means by which L.G. essentially advertises its valuable products to the consumers. And so having been excluded from this particular race pursuant to this agreement that I have referenced, that channel whereby consumers are told of high-quality, less expensive parts that can allow you to—yes, Your Honor. My understanding is, though, that despite not having the Michelin tires, that your car raced for several races in 2008, and this alleged disparagement or whatever by GM did not occur until September 2009. Is that right? Yes, Judge, but I think I need to separate those issues a little bit because I think that conflation is a bit confusing. Yes, it is true that L.G. Motorsports did in fact race in the American Le Mans Series. The allegation, however, is that it was never able to obtain the Michelins due to GM's essentially using its market force and the fact that it's the—Michelin is the primary supplier for the Corvette in the industry and on actual street-level Corvettes to preclude L.G. from getting those Michelin tires. And so, yes, it was in the race, but for all intents and purposes, it could not in any way be competitive. And we know that because it's in the record that L.G. would do testing on the racetrack, and essentially the difference that they could get with even just Michelin tires that you could get over the counter, over the rack, would allow it to go substantially faster than even— I don't understand this focus on tires. Yes, Judge, absolutely. I wish that I were an expert in this and I could explain why Michelin's technical prowess in this field means that you win with Michelin tires. But as we alleged in the complaint, at the time of the complaint, no other team had won but with Michelin tires. Additionally, as tested against Kumho tires, which L.G. was able to use, it wasn't even close. The Dunlops are only close for a short amount of time. So you attribute nothing to the engineering skills of Riley or of L.G.? Obviously, those skills are important. Or the pit crew or whatever? All of that makes a difference, Your Honor. Yes. But what we do know is that L.G. undertook to qualify one time using Dunlop tires. And the reason you can use Dunlops is they're about as fast as Michelin's for, we allege, the first maybe six or seven laps. Over an extended time, however, they break down, they wear out more quickly, and their performance falls off dramatically pursuant to the testing that L.G. has done and which is alleged in the complaint, Your Honor. So, yes, all of that matters, but what we know is, and as we allege in the complaint, a team of similar skill, financing, all of that, all things being equal, the denial of Michelin's is what makes you lose in this case. Explain to me how, and you stipulated that, I'm sorry. I was just going to quip Michelin should pay you for advertising in connection with this. I think that the magistrate actually indicated that same thing, Your Honor. But to be completely truthful, that is, the loss of these Michelin tires is what precludes winning in this field unless you have, or even competing in this field reasonably, unless some other kind of performance modifications are made. GM came out of, we'll just use the term bankruptcy, on the 10th of July, 2009, and you stipulated that it can't be liable. There's no liability for GM prior to that date. So why is GM even in this action? Because supposedly Michelin tires not being awarded L.G. occurred long before that. So how is GM in this action? Absolutely, Your Honor. That's a great question. As we allege in the complaint and as the record actually shows, there was, and I'm going to take it just a step back just to give some context, L.G. competed against GM in what's called the World Challenge series of races. L.G. was actually beating GM in those races, and then there was some kind of a scuffle. L.G. decided that it was going to move up to the GT2 series in the American Le Mans. At that time, L.G. was informed, and this is old GM, that they would not, that GM would not be entering the GT2 class of American Le Mans. So basically L.G. was going to be in there by itself. Eventually, GM did decide to get into the American Le Mans. And to specifically answer Your Honor's question, prior to the bankruptcy, yes, there was a communication, and GM told Michelin, pursuant to the complaint, that you should not provide these tires. Then the bankruptcy happens. Date. What's the date of that initial? Month and year that GM told Michelin you should not be providing these tires to, I'm sorry, that GM told Michelin don't provide these tires to L.G. That was prior to the bankruptcy, Your Honor. But after the bankruptcy, as we have alleged, post-bankruptcy, we have also alleged that there is a separate and new agreement with what we call, quote-unquote, new GM and Michelin. And the reason we know that, Your Honor, is that there was a bit of confusion about whether after the, quote-unquote, bankruptcy, GM was going to be reentering the GT2 series because obviously a lot of things were up in the air at that point. There was communication at that time between Michelin and L.G. Motorsports. Well, you know, maybe now, since GM's kind of getting out of the way, Michelin would provide these tires. And then suddenly, Sylvia Mimone tells Lujulati of L.G. Motorsports, well, I have to go and call GM and make sure that's fine. Give me the date. I know that that is near August of 2009. I don't have the exact date. The reason I say it's August of 2009 is because they held a meeting in person, and then after that meeting in person, you get this letter coming back in August of 2009 saying, okay, it was great talking with you. We're not going to supply you tires. Yeah, but I thought all the damage occurred in the 2008 racing season. Am I wrong about that? Well, being precluded tires is the damage, and it's an ongoing. I understand that, but it occurred – but you bought the car in 2007 and 2008, right? And then it raced in 2008. Yes, Your Honor, but the – So we're through the August – we're through the 2009 season by the time you claim you have this evidence. Well, Your Honor, it's not simply the purchase of the car that we're complaining about. It is the ability to continue to compete in the American Le Mans Series. The C6 Corvette at this time was still a viable race car. They had not yet moved on to the C7, and so being precluded tires, they couldn't get a person under contract for the upcoming season. All of these advertising revenues were lost. Are you talking about the racing season for 10, 2010? Well, my point is that it could have continued to race. Eventually, since they couldn't get Michelins for a long period of time and had to settle with Kumos or Dollars or what have you, that they essentially, quote, unquote, per luge lottery parked the car. So they stopped trying to race at that point because they couldn't get Michelins. It was essentially a lost cause, and they couldn't get someone under contract. Does everybody have Michelin tires at races? Of course not, Your Honor. So there are other tires available. Other tires are available, yes, but I think that's an important distinction to draw because the Michelins were, for all intents and purposes, at the time we alleged the complaint, the only ones that had ever won. And the testing done showed that Michelins were the only ones that could get you kind of over that hump, that three-second hump that they were continually chasing. None of the other tires, as we alleged in the complaint, came close. And that's what's at issue, Judge. This is a Rule 12b-6 dismissal. So all of these things in our complaint— Well, it's 12b-6, but if this is your antitrust claim, are they correct that you failed to object to the magistrate judge's report and therefore were basically on a plain error standard? That is a great question, and I'm glad you asked that, Your Honor. No, you keep saying these are great questions. It would have helped if you had filed a reply brief and respond to these points about plain error on several points and all of these other things. Thank you, Your Honor. You didn't even request oral arguments, so we need some help here. Yes, Your Honor, and I will endeavor to give it to you now. With respect to the magistrate judge's order—or recommendation, rather— it specifically said, Failure to file written objections to the proposed findings and recommendations contained in this report 14 days after service shall bar an aggrieved party from de novo review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court, except on grounds of plain error. So, Your Honor, clearly a distinction is drawn by the magistrate in his recommendation. So we—I looked at the Douglas case, and it simply says that, yes, you do have a waiver situation, or a forfeiture, technically, situation, provided that the party has been served with notice that such a consequence will result from failure to object. Well, Your Honor, this is a Rule 12b-6 issue, so we're not dealing with a findings of fact here, and it only precludes review by the district court, not appellate review. Do you have any—I mean, we have loads of cases interpreting Douglas, and I just wonder, is there anything that supports or opposes that position? Well, I mean, clearly what I'm saying is— I know what you're saying, and I'm saying, do we have any cases interpreting Douglas in the way that you want—are doing it? I'm simply reading Douglas for what it says and reading the opinion of what the magistrate judge said. There's no way that we would— Well, no, Judge. I don't think that's exactly fair. Well, the problem is—I mean, Douglas is a great opinion, of course, written by one of my colleagues on the bench here. But it is at least 10 years old, and I can tell you from experience that we have loads of cases interpreting Douglas, and you may be right. I just was grasping, groping for authority. Your Honor, what I didn't find is one where you had the magistrate judge divvying up what was reviewable by appeal. So what the—that's the point that I couldn't find. So what I can do, though, is look at what the magistrate warned us about, and he warned us about waiver through factual findings with respect to the district court. But I didn't see any where you had the split between this is reviewable before the district court and this is waived before the appellate court. All I can do is, frankly, Your Honor, go by what I am warned about. You didn't file an objection to being dismissed under 12b-6 to the antitrust claims, an issue of law, and the district judge could just, I suppose, review that under plain-error standard of review. Are you saying it's resuscitated on appeal? No, no, Your Honor. We did object to the dismissal of the antitrust grounds. Not according to your opponents. They're saying you did not file an objection before the case was heard by the district court to being dismissed on an antitrust basis. We'll have to just check the record, but that's what— I will check the record as we break it. I'm sure they'll enlighten us on when they're arguing. Yes, Your Honor. What about the Rule 56d? Is that also plain-error standard of review, where you say the GM didn't provide a sufficient corporate representative for his 30b, whatever it is, deposition? Judge, no, because I don't believe that that is, as it indicates here, that's not a factual finding. What we have there is simply, over and over and over, a failure to provide an adequate witness, and we were required to respond to a motion. You didn't provide an affidavit when you came and tried to stop summary judgment on this torturous interference with a contract. No, Your Honor, we didn't provide an affidavit. We provided the deposition of Lou Gelati, and we provided the affidavit— Under Rule 56d, you're supposed to provide an affidavit to the district judge or the magistrate judge saying why summary judgment is not appropriate at that time, and they state you didn't file one. Oh, yes, Your Honor, we did not file an affidavit on that point, yes, Your Honor. So then you don't have a basis for saying that summary judgment was inappropriate at that time. With respect to that very narrow point of the failure to provide a corporate representative, yes, Your Honor. And is that your main basis for saying summary judgment shouldn't be awarded because the corporate representative couldn't answer your questions? No, Your Honor, absolutely not. And so what is your basis for saying promissory—I'm sorry, for saying torturous interference? Is this the supposed comment by this man Fahan who's not even on appeal? No, Your Honor, it's not Fahan. It is a crew chief for the Cadillac team racing in the American Le Mans series where he said you didn't ever really think you were going to get Michelin's after beating GM down in World Series. Do you think that's sufficient evidence to stop summary judgment? Not that alone, Your Honor, no, absolutely not. Okay, what else have you got? Sure. I have where Sylvia Mimone tells Lou Gelati that I have to check with GM and then he gets the no answer. So repeated times in the record he is told by Michelin, by their representatives, that the reason he's not getting this is because GM doesn't want him to have it. And then Michelin says—provides kind of misleading statements about you—we don't want your data to get interfered with. But that makes no sense, Your Honor. They simply don't have to combine or otherwise review the data in tandem. So these pretextual issues are also a problem. So he's told it on multiple occasions. I have another procedural question. We're taking you past your time. But GM also in its brief at 14, note 10, says your brief before us is simply the brief you presented opposing summary judgment to the district court, and that's why you don't respond to various procedural aspects. Is that correct? Is it nearly the exact same? You just cut and pasted your brief to the district court in your brief here. No, I don't think that's accurate. I think that there are portions where we use some of the same argumentation, but is it a cut and paste? Is it—no, Your Honor, I don't think that characterization is fair. Okay. You have some time for rebuttal. Thank you, Your Honor. All right. Excuse me. Okay, Mr. Daniels. May it please the Court. Let me ask you a preliminary question. Am I correct that following the bankruptcy of GM, GM and GMAC became separate entities? GMAC? General Motors Acceptance Corporation, the finance arm of GM. I believe that it was already a separate entity before the bankruptcy. Well, the only reason I ask is that I was—I'm pretty confident that that's the case. But my husband and I own a $5,000 bond. Maybe it's $10,000. In GMAC. And when I saw this, I thought about that bond, and it wasn't on my recusal list, and I'm pretty sure that at least after—if anyone can enlighten me, otherwise I'd ask you all to bless this if it's a conflict of interest. Your Honor, I'm confident— Otherwise I'll have to recuse. GMAC, my understanding, was a separate entity well before the bankruptcy. It had already been spun off by GM and was a stand-alone corporation. It wasn't even involved in the bankruptcy. So I don't believe you have an issue here, Your Honor. With respect to GM, there's really two issues raised on appeal. One has to do with the antitrust claims. The other has to do with the grant of summary judgment on tortious interference with prospective contract. I will confirm there was no objection to the dismissal of the antitrust claims. The only objection that was made had to do with the dismissal of the disparagement claim, which isn't an issue on appeal. The plaintiff wanted a right to replete that claim. With respect to the antitrust claim, even if you were reviewing it de novo, I would just point out there is no relevant economic market ever defined by the plaintiff. He's talking about a racing series, a competition, athletic competition, not an economic competition. And clearly he never points to any harm to any economic actors based on anything that he's alleging in the complaint. On that basis, even if we're going de novo, the complaint clearly was properly dismissed by the district court. I was struck by how we kept getting rulings, amended complaints, rulings, amended complaints. The first complaint, they threw out the antitrust claims. Then he files another, an amended complaint. Is the antitrust claim even presented in the amended complaint, or was there some agreement? Well, you don't have to replete this again. You're already out of court. You can bring that up on appeal. It was not replete. There was no agreement with me, or I'm sure Michelin, as to what the status of that was. I'm sure I would guess the plaintiff believed having been disposed of, it would have been preserved, had he objected and done other things in terms of getting a full de novo review. But it was not included in any of the amended complaints. I will say the amended complaint that led to the summary judgment, many claims were dismissed by summary judgment, only two claims. One is to Michelin, and actually none as to Michelin with respect to that amended complaint are being appealed. The district court did allow him to then file one further amended complaint only against Michigan. GM was out of the case at that point. All claims against it had been disposed of on summary judgment. So there were really three, a series of really four complaints, one in state court. Then he dropped old GM. The antitrust claims were dismissed. Another amended complaint. All the claims in that amended complaint were disposed of by summary judgment. Then another amended complaint with the one claim against Michelin. Well, let me just say, on this antitrust thing, it's not entirely clear to me that we don't have a relevant market because their allegation is that they were using the race car business to enhance their reputation in the sale of aftermarket parts for other race cars and in building race cars. Now, I know GM is not in the business of building race cars other than Corvettes, but what about this arguable competition of the aftermarket for those kinds of parts with GM's sale of parts? Well, I guess I'd address it in two ways. First, with respect to Section 2 liability, there's absolutely no allegations that General Motors somehow monopolizes or is attempting to monopolize the afterpart market for Corvettes or any other vehicle. With respect to Section 1 liability, was there some agreement that would harm competition in the marketplace? Again, if the relevant market is aftermarket parts, there's no allegation in the complaint that the afterpart market as a whole was in any way affected by any action by GM and Michelin. And the third point I would raise is Section 1 liability requires an agreement between GM and Michelin, ultimately because the plaintiff went forward with his claims of conspiracy, claiming that GM— No, Your Honor. I mean, the only allegation is that GM, apparently because it buys a lot of Michelin tires, has some ability to put pressure on Michelin, I guess would be the best reading. It's not that they're in competition, it's Michelin— Well, I think that might be, you know, if that fact is true, that might be a pretty good incentive to Michelin, but that's not necessarily illegal. That's where I was going, Your Honor. There has to be some agreement between Michelin and GM to affirmatively try to suppress or hurt competition. Ultimately, the district court found, in relation to conspiracy claims and other claims that required an agreement between Michelin and GM, that there was no evidence of such an agreement. I don't think it's properly pled in the complaint because he doesn't say when it was made, how it was made. Clearly, we've already focused on the idea, my client, GM, can only be responsible for anything that happened after July 9th of 2009. But in the complaint, there's nothing that says, okay, on this date, GM and Michelin got together and they made this agreement. But even putting that aside, the district court ultimately found there was no such agreement. Now, I think if that is an issue, that somehow the complaint, you could possibly read it to say there was an agreement, you can remand and say, well, clearly there's no evidence of an agreement, summary judgment should be entered on that antitrust claim. Because ultimately, the plaintiff could come up with no evidence that Michelin and GM entered into an agreement to not provide him tires. All the evidence was Michelin made an independent business decision based on dealing with all these competitors, who they wanted to work with, and who they didn't want to work with. And is there any allegation in the complaint, and again, he didn't keep presenting his antitrust claim in his amended complaint, is there any allegation there that this supposed alleged agreement between Michelin and GM in August 2009, that at that time they were still trying to race? Is there anything that says we were still trying to race but couldn't get those tires? Well, Your Honor, I'm not sure on the exact date I believe they did at least attempt to race, but I will tell you on August 9th, General Motors was not racing. They didn't race in 2008. I believe the first race they entered was in September of 2009. It was the first race General Motors even put a team together, the Corvette racing team. So I don't know that there was ever any head-to-head racing competition between LG Motorsports and GM. Now you're maybe bringing things into the record that don't exist because we're here on a 12B6 as to antitrust, but I just want to know, did he plead, did he allege that in August 2009 we were trying to race but couldn't do so because we couldn't get Michelin tires? Your Honor, I'll tell you the truth. I would have to parse it. My recollection is that he did not plead with that specificity. He was pleading mostly about things that occurred in 2008 and 2007 when he bought the car, when he was trying to get the race team going, but I cannot affirmatively say there is no statement. I just don't believe it is in there. I could look and find out easily enough. With respect to the summary judgment— I'm looking at it. I don't see it, but there may be a lot of facts pled prior to the causes of action part five. We'll take a look. Okay, and I can certainly look as well, Your Honor. On the summary judgment, I do think there's a couple of procedural issues there. He mainly relies on evidence that, frankly, was stricken by the trial court and was never taken to the—the magistrate struck it, never went to the district court, and, of course, he doesn't address it on appeal. The defamatory statement that he's claiming was made was stricken by the magistrate judge because it was hearsay. The contract he claims that he would have had with a driver, evidence of that, was stricken by the magistrate because it was speculative. Nowhere after that is there ever an argument by the plaintiff that that was improperly stricken. The district court should have considered it or anything else. So on that basis alone, I think the summary judgment is proper. And again, the defamatory statement, we're referring to somebody saying you really don't think they're going to sell you tires. No, I think if you read his brief, it's Mr. Feehan who supposedly defamed LG Motors at a Corvette get-together after a race. And he says that is the unlawful act of GM that supports tortious interference with prospective contract. That's the only thing he points to as the unlawful act. When did that suppose it? September of 2009, Your Honor. Thank you, Your Honor. Thank you. Mr. Hertog? Good morning. Good morning. May it please the Court, my name is Peter. May I just make a quick comment, Judge? Judge Jones having brought up a point, I don't believe this in any way would require my recusal, but I have a brother who owns a Cadillac dealership. So if someone wants to try to get me recused on that basis to quote someone else, bring it on. But I don't see that as an impediment. Michelin has no objection. Well, I'm not surprised you don't. But Mr. Healy, you're on notice. I need new tires, but I haven't bought them yet. So I think I'm okay. My name is Peter Herzog. I'm from Wheeler Trig, O'Donnell in St. Louis. I represent Michelin North America on this appeal. The plaintiff, LG Motorsports, has appealed two of the district court's rulings in favor of Michelin, the antitrust dismissal and the summary judgment on the promissory estoppel claim. My intention is to spend the majority of my time addressing the promissory estoppel claim and the judge's entry of summary judgment on that claim. It's a claim that's governed by Texas law. There are four elements of the promissory estoppel claim. We contend and we believe we argued in our brief that the plaintiff failed to make a disputed issue, failed to submit sufficient evidence to create a disputed issue of material fact on any element. The promissory estoppel claim is based on a 30-minute meeting that occurred in Atlanta at the Petit Le Mans in October of 2007. Now, no matter what happened actually at that meeting, the district court concluded on the basis of Mr. Gelati's own testimony that at a minimum, Mr. Gelati left that meeting understanding that a contract would be required with Michelin before he could receive Michelin racing tires for the 2008 season. Mr. Gelati also testified, and it's undisputed, that he understood as well that he would have to post a performance bond, the amount of which he didn't recall, that he would have to provide proof of sponsorship, that he would have to provide proof of funds, and that there were additional details that would have to be worked out. And we believe that under the relevant case law, that this undisputed fact that the district court relied on precludes the plaintiff from showing at least three of the elements required for promissory estoppel. First of all, because a contract would be required, the parties would have to negotiate and execute a contract, because there were other elements that would be required before he could obtain the tires, there was no promise that could be enforced. It was just too vague to be enforced. Judge Jones authored an opinion, which Judge Prado joined. I think it was in 2010. It was the Hartford Fire Insurance opinion, Hartford Fire Insurance Company versus Mount Bellevue, City of Mount Bellevue, Texas. And we cited a number of other cases in our brief, but that case holds that the promises there were too vague to constitute a promise that would be enforceable in that case to preclude the running of the statute of limitations. We think they were similarly vague here, similarly vague under the cases that we've cited in our brief. Second element is that the plaintiff, LG, has to show that they reasonably relied to their detriment on that promise. We now assume that the promise was made, as the Court did. If LG Motorsports knows that a contract has to be negotiated and executed, then they can't reasonably rely to their detriment on something that was said at the meeting. The law does not allow a party who knows that a subsequent written contract is going to be required to claim that when the contract isn't executed, well, I can proceed on a promissory estoppel theory. I believe, is it correct that there was some evidence that they had already purchased a car or were buying the car for $100,000 before the entire discussion? Yes, Judge. That's another reason why they could not reasonably have relied on anything that was said at the meeting because they had already made the decision to purchase the car more than a month before the meeting. Well, they had put down $100,000 out of what, $700,000? $471,000. Why did the tires cost a half million dollars had they purchased them? Is that right? Mr. Gelati testified that Ms. Mimone from Michelin told him he should allocate approximately a half million dollars for the season for tires. For the season. For the season for tires. They run four to five sets of tires per race. A set of tires is $3,000 to $3,500 per set. And Mr. Gelati may have overestimated the amount that he was, that Ms. Mimone allegedly told him he should put aside. But they did in fact, I mean, they had a prior relationship, didn't they? Hadn't they used Michelin tires before? Not Michelin racing tires in ALMS, no, ma'am. Not LG? No, ma'am. But it used them in the previous class of races. Wherever they had raced previously, they, I don't know that the record indicates what tires they had used in those races. But I don't believe there's any evidence in the record of a prior relationship with Michelin or with Michelin racing in, with respect to the prior class that they raced in. But I want to, I do want to mention Judge Crowder's point again. I do believe that the record indicates that they had already made the decision. Mr. Gelati himself testified that once he put down the deposit, he couldn't simply walk away from the agreement that he had with Riley. So however they characterize it, they had made the decision at least a month before they met with Michelin to buy this vehicle. Mr. Gelati said, I couldn't walk away from it. It was a preexisting duty. That's not detrimental reliance. And in addition, you can't then remake the decision. Once you've made the decision to buy a car, you don't remake it. Subsequently, you may make additional decisions, but you've already made the decision to buy the car. And that was the evidence that he had. He testified and judicially admitted by, by affirmatively pleading it, that he made the decision to buy the car on the basis of old GMs, not new GMs, but old GMs representation that they would cooperate with the homologation of the vehicle as a racing Corvette, not because of Michelin tires. The third element that is required is the plaintiff has to deduce sufficient evidence to create a material dispute of fact on whether Michelin could foresee the reliance. Now, for the same reason that LG can't detrimentally or reasonably rely on statements made at the meeting when it knows that a contract has to be negotiated and executed and a variety of other things have to come to fruition, Michelin could not foresee LG relying on something said at the meeting, knowing that the parties would have to negotiate and execute a contract. Finally, although it's not dispositive of the issue, I would, the fourth element of a promissory estoppel claim under Texas law is that injustice can be avoided only by enforcing the contract. Promissory estoppel is a supplement to the law of contract. It's not, it's not to supplant the law of contract. And in this case, it's undisputed that Mr. Gelati left the meeting in October 2007 knowing that he was going to have to execute a contract. We submitted to the district court an example of one of the contracts we executed. That contract had a variety of protections that would have been available to Michelin had the parties actually consummated the contract that everybody knew. Does Michelin prepare tires to the owner's specifications or does it have a racing class type tire and the whole point of this contract is just to secure payment for supplying these tires? No. It's a very complicated process, Your Honor. Michelin, in addition to supplying tires that are specific to the vehicle, one thing in the record I think you'll note is that Michelin did not even have a tire that would have fit the LG Corvette in 2008. All of the Michelin tires, and this is also undisputed, that were available at that time. So what was Ms. Mimone promising? Well, we would say, Judge, that she wasn't promising anything, but that's a question of fact. Well, we're obviously talking about tires, so let's assume, I mean, I remember that point that you made, but all I'm asking is when you're talking about providing tires for a race car or owner of a race car, are they custom-made tires for that car? Yes, ma'am. And in addition, we provide an engineer that evaluates the performance of the tires on that vehicle. So, yes, they are custom for that vehicle. So it's not just a statute of frauds deal. It is a contract for services, not just goods. It's primarily goods, but there are services associated with it, yes, ma'am. And I don't know that, I believe the statute of frauds does apply, but it's not essential here for the other reasons that there was no reasonable reliance. Okay. Thank you. I'm just curious, is the record still intact that every car that's won has Michelin tires? No, Your Honor, they lost at Dunlop. Thank you. Your Honors, I pulled up paragraph 42 of the original complaint to address one of the concerns that Your Honor had. In it, we plead, in or about August of 2009, Michelin confirmed the anti-competitive conduct of the defendants when it expressly told LG Motorsports that new GM did not want LG Motorsports to have the tires. Michelin refused to even provide cast-off tires, which were not as good as those being used at the time. They went so far as to refuse to allow LG Motorsports to use commercially available over-the-counter tires in the race by labeling them as non-approved. So, Your Honors, I wanted to just bring that up because you had asked for the specific time frame and whether there was an allegation with reference to new GM. I'd like to address Mr. Kilgore's argument briefly that there is no economic or injury to trade. Mr. Hertzog or Mr. Daniels? Mr. Kilgore didn't make an argument. I'm sorry, a different Tim, Your Honor. My apologies. Mr. Daniels. That there was no economic injury. Your Honor, I believe there are at least four different ways that trade has been restrained in this matter. One is in the matter that's very close to the Chloris case from 1959. There, as Your Honors may likely know, there was a retailer who was selling appliances such as refrigerators, things of that nature. A direct competitor of that entity entered into an agreement with GE, Admiral, other retailers to preclude them from providing those necessary elements for competition. The Supreme Court said that that – let me also bring up the defendants in that case said, well, there's no injury to trade there because this is only one competitor. Obviously, you can go all over San Francisco and buy these type of refrigerators or what have you. The Supreme Court flatly rejected that notion and indicated that whether you stamp out competitors one at a time or in full gallop, it's still an antitrust injury. Second, Your Honor, the nature of the race is for consumers to purchase tickets to these races, to view them on TV. The nature of the race itself is made qualitatively worse such that the consumers aren't getting what they deserve. And a large part of that is this David versus Goliath nature of the competition between a non-factory Corvette team and a factory Corvette team, an upstart versus an entrenched entity. And so when GM uses its ability to influence Michelin not to provide tires to its upstart competitor, the race quality is made worse. It's almost as if – I think about March Madness that just went by. If you stop the mid-majors from being able to compete, the 16 and 15 Cs versus the 1 and 2s, suddenly March Madness, it's not as good. It's not as interesting. It's a worse product for consumers. Third, I think that the injury to innovation with an upstart is also at issue because obviously no one has the budget that GM has. And LG being able to compete on a much, much smaller budget drives them to engineer new and different ways to try and keep up, which they do and which consumers enjoy in the consumer products. I'm sorry, Your Honor. Just for the sake of argument, in what races is LG competing now? That car is no longer racing. I understand that. LG is no longer racing, Your Honor. It's not racing? Not to my knowledge. I don't believe that's in the record, but not to my knowledge. I know that they parked the C6 Corvette. It's in the Corvette Hall of Fame. Still an auto dealership or parts repair or something? Yeah, they supply parts. They do some work constructing cars, but it's my understanding they've also started to get into selling Porsche items as well as the GM thing. And do you have any objection to my or Judge Barksdale sitting on the case? Of course not, Your Honor. So unless Your Honors have any more questions for me, I will end this argument. Thank you, Your Honors. All right. Thank you. Okay.